Case No. 23-3394 Premier Dealer Services Inc v. Allegiance Administrators LLC Arguments not to exceed 15 minutes per side Mr. Samuels, you may proceed for the appellant Morning Good morning, Your Honors. Andrew Samuels for Allegiance I'd like to reserve three minutes for a bono The District Court misapplied the Copyright Act with its non-existent Scenes of Affair analysis, internally inconsistent disgorgement analysis, and redundant fee award. Starting with Scenes of Affair, the District Court did not do a Scenes of Affair analysis. Instead, it held on summary judgment that Premier's fill-in-the-blank loyalty program form was original. But Scenes of Affair trumps originality. Original or not, the form is uncopyrightable Scenes of Affair. Insurer requirements and other external factors dictate the text of these program forms. That's why third parties like Heritage and Great American use similar language in their forms. There are only so many practical ways to say what's covered, what's not covered, and how to maintain coverage under one of these programs. The District Court was wrong to disregard these third-party forms because of what it found to be differences between the programs at issue. As Premier's fond of saying in its briefing, copyright protects expression, not ideas. It doesn't protect programs. So when you say fill-in-the-blank, as you did at the outset, that is true on the forms. But I didn't think that was the part that they thought was protected. And when you look at the stuff that is not fill-in-the-blank, it's pretty identical. I mean, I think one has to acknowledge that. And, you know, it's surprising in a way that copyright extends to this. You know, I get that intuition. But as you know from our cases, it does. So we have lots of boring copyright cases where the infringer loses. So how do you say this isn't? You're acknowledging it's copying, right? So you're making the point that, hey, everybody does it this way. But when I look at your exhibits, they're, you know, I'll wave them at you, they're really different, whereas the copy is very similar. Right, so copying, this is something Premier does in its brief a bit, and we disagree with this analysis. We think Premier has the analysis backwards, which is you don't start with copying and then determine scenes are fair, right? The question is whether there's anything copyrightable to copy in the first place. So that's one issue we have with that part of the analysis. Another issue we have is even if there are differences between the example forms that we put in front of the district court. Let's just do one thing at a time. So your first point is, one, it's not original, is that what you're saying? No, it's scenes are fair. Right, so I get the point, but your evidence for scenes are fair is a bunch of forms that show quite a bit of possibility for variation and certainly no mimicking by them. In other words, scenes are fair is where you're just stuck with, you know, the face mark illustrates that, and I realize software is a different setting, so you've got to pay attention to that, but you're stuck with 0s and 1s, and algorithms are, these are the only options you have. It's really strange to say that's true here, or at least I'm not understanding why that's true here. Scenes are fair is a little broader than that, in that it's about whether external factors dictate the expression. The forms are some of our evidence. We also have evidence that, for example, Tricor's insurer needed to approve the language of any form that Tricor was using. We've got testimony from Premier's president saying that similar insurers use similar language in their forms, and so that was enough to raise a factual dispute of scenes are fair, enough to raise a tribal issue of scenes are fair, and instead the district court decided this important affirmative defense on summary judgment without even doing a scenes are fair analysis. I mean, even separately from everything we're talking about, it doesn't change that the district court didn't even analyze this affirmative defense. It analyzed everything under the heading of originality, which is a different copulatability requirement. So that's an interesting point. What's the prejudice there? So in other words, I think you have to acknowledge that, as lots of the cases do, that merger and scenes are fair overlap. So if you think of it, even if you decide it's solely an affirmative defense, you can't deny that it goes to originality. In fact, a lot of your argument proves it. That's a lot of your originality argument, are themes along the lines of what else could we do. So there's overlap here. So whether you treat it as solely there's a presumption of originality because it was registered. Now we can rebut that or deal with that through topics that relate to the phone book, Feist. That's an originality case which has some overlap with merger and scenes are fair. Or you do it as an affirmative defense. How exactly were you prejudiced? We know there's overlap. So what would be the prejudice by not formally saying, okay, I'm not thinking about this on originality. I'm solely thinking about it as defense. How were you prejudiced? The issue would be on originality, it is a stricter analysis, and we're looking at is this exact expression out there. Sons of Fear, on the other hand, asks even if there's not a one-to-one example of the expression that's already out there, still is it so constrained by external factors? I totally understand. I'm asking you how were you prejudiced by what you're saying is an order of operations problem. You're saying Judge Sargis took our cases to mean he has to think about this at the first step. Tell me how you're prejudiced because it seems to me his analysis contemplates every argument you would have as, quote, an affirmative defense. Do you get the point I'm making? I think I get the point. I mean, the prejudice would be that we didn't get the opportunity to present to a jury the kind of issues that Your Honor just raised, which is pulling up that heritage form and saying- No, but no, you're trying to show it's a triable issue of fact. It doesn't get you around that. Tell me what you mean by- I don't get the point you're making there. What I mean is if there are differences between these forms, for example, the heritage form and the premier form, our position is that a jury should have been allowed to look at those and decide for itself if these forms were so different that Sins Affair doesn't apply or are close enough that maybe this expression is dictated by external factors. And you're leaping from affirmative defense equals automatic jury is what I take your answer to be. Certainly here where there was no analysis of Sins Affair. Just move on with your argument, but for rebuttal, just think about what I just said. If he had an order of operations problem, how were you prejudiced? That's the key thing I'm trying to figure out, and I'm not sure I'm understanding the answer yet, but move on. Sure, happy to bring that up on rebuttal. I do want to also talk about disgorgement because in this case- Before you go to disgorgement, counsel, can I ask you one more question on the Sins Affair analysis? My understanding was that when the district court looked at this issue, it did look at your-at least the PDS executive, Greenweller, and looked at this other argument that you did make, that we were constrained that the insurer asked for this, and the district court looked at it and said, these are service contracts, it's not the same type of contract, and that the testimony wasn't that these specific words have to be included or a specific way to frame them all, but just that maybe some elements need to be included, and again, as the chief said here, we're not talking about the copyright of the idea, just about the particular way it's expressed. Exactly, and the district court disregarded that evidence that your honor just described on the basis of idea as opposed to expression. The district court disregarded this because they said, these are different programs, and the issue is the expression, not the idea of the program. But if you're saying, my understanding of the district court's decision was that, and it wasn't your expert, did you have an expert in this case? We did. You did, okay. Well, the one that comes out here is that, well, Greenweller was testifying to about kind of a totally different type of contract, and did not testify about the expression that the language needed to say, so there was indication there that, you know, you weren't bound to use a particular language formation. And what did your expert say that maybe the district court missed? Our expert said that this language is common throughout the industry, that insurers require it, all the things we were talking about. And this is the King report? This is King, and this is the sort of thing that our fact witnesses could testify to at trial. I mean, this is another example of prejudice, I suppose, is that had at least our fact witnesses, if not King, had the opportunity to testify on these issues at trial in the context of an affirmative defense of sins and failure, we would have been able to put that evidence out. Your expert, just so I understand the record here, would testify to things like we had to say, and I'm reading off the comparison language, you had to say you are required to have your oil and filter changed and your tires rotated. You could not say something different, like assure that the engine and oil filter are changed every three months or every 3,000 miles. You were bound to use one formulation about talking about oil and filter change. No, not the exact words, and that is one of the differences between originality and sins of error right there. Originality is minimal degree of creativity, and sins of error is not similar. That's a question from either angle, whether it's as an affirmative defense or the originality inquiry. Either way. What's the point? What is your answer to this? The point is that the range of expression is dictated by external factors, not the exact phrasing, and we've not taken a position of the exact phrasing. What is your best case for the sins of error range of expression point? What's your best one? May I give two? Please don't disappoint me. It's so fun when we go read them and realize this has nothing to do with what I was asking. I know you like Lexmark, but Lexmark talks about practical realities, practical realities dictating the text of these forms. We understand that. RJ Control, I would also point to RJ Control, because this ties into our sins of error argument as well. There's a passage in RJ Control, this is 457, 981 F3rd at 457, and it says if you have copyrightable and uncopyrightable elements of a work that are inextricably intertwined with each other, then the whole thing is uncopyrightable. So when we're talking about picking apart certain phrases and then saying, well, this part could be phrased a different way, that part could be phrased a different way, RJ Control says if there's enough sins of error in there and it's all intertwined, the whole thing is uncopyrightable. And we've heard from Premier, Premier's taken a position that this form is very important, the way this form is put together somehow has some sort of persuasive power that gets people to participate in the LPLP program and gets dealers to buy in. If that's the case, this is all intertwined, and we've identified at a minimum examples of text. Why don't you do a quick disgorgement argument. Sounds good. The quick disgorgement argument is we've gotten really far away from Bosley and Ecamos with this case. In Bosley and Ecamos, you could at least point to a single specific transaction where you're coming up with revenue attributable to the infringement. In Bosley, for example, a customer buys a magazine, it's got the infringing photo inside, and so revenue from selling the magazine was attributable to the infringement of the photo. And you can point to this one purchase of the magazine. But your response to the point that the calculations come pretty close, I think it was put at the back of the envelope, as the $40 Canadian charge per deal. Why shouldn't I take some comfort? We know it's going to be imprecise, right? That's why it has this burden-shifting component to it. So it's already built in a rough justice approach. Is that just irrelevant, the $40 Canadian? Is that irrelevant, or is that a fair proxy of rough justice? I assume you want to start with me answering the question. I saw we've got the red light. But the issue is not one of calculation. The issue is one of traceability under Ecamos and Bosley. Ah, so it's causation, it's the road you're going down. Well, not causation, but traceability, right? Good for you on the synonyms. Thank you. What would you do without a thesaurus? Well, traceability is what the Sixth Circuit cases say. That's what the Sixth Circuit cases say. And the Sixth Circuit has taken care to say, well, it's not a causation standard, but it is a traceability standard. And so we're applying what the Sixth Circuit says. Maybe we have the same thesaurus. But I guess your point would be, you think the $40 Canadian-performed deal is still not traceable. That's your fundamental answer. It's not traceable because, unlike in Bosley and Ecamos, in Bosley you've got magazine sales, you can look at one transaction. In this case we've got a series of transactions. So we've got a customer in Canada who buys a car from a car dealer in Canada. That's one transaction. That customer, when they buy the car, is automatically enrolled in this LPLP program, or is immediately enrolled. When they buy the car, the program's a dealer giveaway product that's included. So that's one transaction, the customer and the dealer. Then the dealer has an arrangement with Tricor to provide this program. So that's another transaction. Then, also, Tricor pays Allegiance a flat fee to administer this program. Allegiance earns that flat fee as soon as the customer's enrolled in the program when they buy the car. And this form hasn't even come into the picture yet. This form comes into the picture at some point after. After Allegiance has already earned its money because it's memorializing the transaction. And so... But that phrase, memorializes the transaction, does that not cause cognitive dissonance for you? No, because, first of all, the case law, right? ECOMOS, for example, Bosley, they talk about tracing back. You have to trace back from the revenue to the infringing activity. Here, if anything, we're tracing forward. Allegiance has earned its revenue from administering this program. And only after Allegiance has earned its money does this form come into play. It's like a receipt. I mean, essentially, a receipt. I understand the burden-shifting framework here. We have said all that Premier has to come forward with here is some sort of idea of revenue that bears a reasonable relationship or that is relevant. And then it's really the burden on you to show us what your actual deductible expenses are, which I understand here, but then also what part of the profit is attributable to the infringement versus not. And it seems to me that you would be in the best position to know that information because you obviously will know your operations better than the other side. What was your evidence here about which part of the profit was attributable to the infringement versus other value add, excuse me, of administering this program? That is in the damages order, and we got that number reduced based on some of that. I think you're talking about the kind of portion of the profit that is attributable to the infringement versus other value that your client provided. No, Your Honor, this is a step one argument. This is step one of the burden-shifting. I understand better now. I think we got it, so we'll give you your full rebuttal. Okay, thank you very much, Your Honor. We'll hear from the other side. Good morning. Good morning. Scott Thomas for Premier Dealer Services. With me is Greg Krabacher. On May 31, 2018, five minutes after midnight, Michelle Fish sent an e-mail from somewhere in Canada to the Chief of Staff at Allegiance, asking questions about this form. Let's just go right to the arguments here. So Senza Fair, I think the point your friend on the other side is making is this isn't deciding how I'm going to write Hamlet. You really are stuck with a lot of information that has to be there. Like there's lots of phrases, because the programs are the same across different companies. And so he's making the point that whether you think of it as an affirmative defense or an originality issue, the author really is confined, is I guess the point that they're trying to make. And then he adds to it, if you've got some sense of fair, and it's inextricably intertwined with everything else, well then the whole thing is not original. So how do you deal with that? We have the documents in front of us, so we see that. But we also see some obvious points that you really do have to talk about wear and tear and these other things. Certainly, Your Honor. Certainly. First, there is no evidence that was presented competently on summary judgment. Your Honor asked about the expert. The expert, Mr. King, showed up two months after the summary judgment ruling came down. There was no expert testimony from allegiance on summary judgment. I want that to be clear. The only evidence that was offered was the testimony of Ms. Greenweller that related to a vehicle service contract, a completely different animal. Tricor has its own vehicle service contract. If that were identical, if that were to accomplish the same end, there would be no need for this lifetime program. So there's no evidence in the record to support that. Are you saying this would go to a jury had they put the evidence on the doubt set? No, Your Honor. I also believe that the evidence on that is incompetent. They had complete access to insurers. There's not been any testimony from any person that any word was dictated. Oil? Oil is not dictated? No, Your Honor. What? It's not dictated by an insurer. No, but that's not the only meaning of sens affaire. Agreed. So oil is dictated. That is covered by sens affaire, no? No. To the extent that something is sens affaire, a scene that must be done, there are a variety of things that a person wanting to create this program might include. Some people might want oil changes. Others might want radiator flushes. Others might want transmission fluid changes. The constellation of things that could be put into a program of this kind, none of it is de rigueur. Now, oil changes are pretty basic. If it's standard in the industry, we would expect all the different insurers to expect at least oil changes, filter changes, at some duration. So to get back to the Chief's question, are you saying just even using the word oil is not dictated at all? Well, let's be clear. Premier is not saying we've copyrighted the word oil and no one else can use it. Right, that might have been your first answer.  Okay. Glad I hit on one the court liked. No, but I mean you should acknowledge that these programs, there are conventions in the programs and the question is whether the programs as opposed to insurer requires only one way of expressing it. And I thought the way to think about it was, I thought what Judge Sargas was saying, which, yeah, of course there are lots of phrases and concepts because they share the same idea as a matter of business. But there's an awful lot of different ways to put it and that's what gets you into the expression problem. And I think this court hit on that in Lexmark. It's also mentioned rather well in the court's opinion in the Winfield matter, the case with the witches. They talk about, they cite with approval a case out of the second district, the Maxwell case, which involved dolls that had wide-set eyes, upturned noses, and bow lips. And the court said, Mattel, you can't get a copyright protection on those things because they're stock. They're cens a faire. However, if someone comes in and takes your entire doll with the particularity of those features that you've chosen to use, that's copyright infringement. And that's kind of what we have here. The affirmative defense point. So I sometimes wonder if Lexmark's been a little over read in terms of saying you don't look at cens a faire and merger as an affirmative defense. I mean, I think it's a little complicated because you can see how merger and cens a faire have aspects that do go to the originality, but then you can also see why someone might say, well, let's be careful here. Let's do the originality inquiry and then cens a faire can be in a defense as well as something that shows zero originality. And, you know, I took Judge Sargas to be focusing more on going to originality, and I guess most of the briefing kind of did that. But if it's an affirmative defense, might that change the way the case comes out here? And I acknowledge that there's a split in the circuits about looking at it through that prism, but let me say two things. First... I don't care what you say, but can you answer my question? I'm trying to figure out if there are ways in which it would change the presentation of the evidence and possibly Judge Sargas' opinion had you looked at cens a faire through the lens of affirmative defense. I think you answered the question earlier when you used the word overlap. The overlap is so profound that to me you could not... you could not parse cens a faire from originality. Well, you could have a document that has some original things and some not original things, or you could have the whole document be original but some protected by cens a faire. Isn't that how it could differ? Exactly. Agreed, Your Honor. Agreed. That's feist, you know, with the alphabetically arranged. Common expectation is we're going to want phone numbers, we're going to want it alphabetical. That defeats the originality there. Even if it was an original creation, that is so commonplace that it becomes a driving... it's a parameter that must be met and so there's no other choice. What about disgorgement? So, you know, it does... I can see someone thinking, gee, wow, this was worth a lot. I mean, not the most creatively written document in the world and this is a lot of money for a copyright infringement. The reply brief of allegiance urges this court to adopt a rule that in order to get disgorgement, the product has to... the infringement has to be part of the final product and they focus on what I think is probably a typo in Judge Sargas' opinion at page 7343 when he says, even though the LP certificate was not part of the final product sold, I'm convinced he meant even if because the citation after that sentence is to Ekimos and contrary to what allegiance said in its brief, allegiance tried to say or did say to this court that in both Lexmark and in Ekimos the infringed material became part of the final product. That's true in Ballsley. The picture was in the magazine. It's not true in Ekimos. In Ekimos, the software was part of the test that checked out the equipment at the end on the assembly line and to try to extrapolate from this turn of phrase that a new rule is emerging that it's got to be part of the final product, that's never been part of the test in any circuit. I've not found any judicial support for that idea anywhere and so I think that to me is the key point on disgorgement. It's related, without it, and there was trial testimony from Ms. Greenwell that I think was persuasive to Judge Sargis about this program is so well designed that the amount of administration work that you have to do on this program is so minimal because compliant car buyers who do satisfy the oil changes and the tire rotations, they tend not to have the catastrophic problems that would be covered under the program. So that's why it's so beneficial and that's why it's inherently traceable to the copyrighted language. The fact that Judge Sargis meticulously, page after page after page in document 266, I believe, going through the expenses and the overhead and all the financial data and carved away a huge chunk with much more precision than either the jury in Bosley, we don't know how they got to 8.5%, we don't know how in ECUMOS they got from $225 million in profit down to a $5 million award, we don't know. But we know exactly how Judge Sargis got there and it was a thoughtful, reflective, and mathematically defensible calculation. So in that respect, it's utterly reasonable for that to be approved. If I could make a final point with regard to the attorney's fees, as the court knows, the award of fees to the prevailing party is the rule rather than the exception. Allegiance urges you to adopt a new rule that if a court awards an injunction, then they don't get the attorney's fees. That would be to reward allegiance for its improper behavior. Would you agree injunctions are relevant, though? Well, they're relevant to deterrence, but I haven't found any... They're relevant to whether you should get fees and the amount of fees, no? Well, to the extent that fees are based, by Judge Sargis in part, on the notion of deterrence, it's certainly a relevant consideration.  And I've not found any case anywhere similar to this. Allegiance didn't knock it off when suit was brought. Allegiance didn't knock it off after the judge awarded summary judgment. They kept going. They said, well, our copying stopped four years ago when Ms. Defow made the copy originally. And just completely put their head in the sand that they were using that copyrighted language every day, making thousands of contracts every month. So the idea... You could feel Judge Sargis' seething about how allegiance had flouted the court's authority with arguments that just did not have any copyright sophistication. I'd be careful when you see judges seething that they're only seething towards one side. Seething toward justice, Your Honor. I mean, that's what we're talking about. I'm going to guess there's no record evidence on this point. No, I just said if you read... My only evidence is the written opinion. And I just get the feeling when he underlines or italicizes the un in the word, it just strikes me that there was serious concern. And it's repeated time and again, both in the discussion about why the injunction was necessary and in the discussion why the attorney-of-few word was necessary. And we don't have anything in the record, unlike Eculos, where there was a special master appointed to supervise this, we don't have anybody in the record saying, I'm an officer at allegiance and we've knocked it off. We don't have anything like that. All we have is a representation in papers from an attorney who may or may not know what's going on up in Canada. So... All right. Thank you very much. Thank you. I appreciate your argument and your rebuttal.  As helpful as the Scenes of Fear discussion was, I think I'm going to take the issues in reverse this time so we can make sure we hit on fees, talk about discouragement, and then get back to Scenes of Fear. On fees, the Premier mentioned that, in Premier's view, fees were the rule rather than the exception. Whatever they are, the Fogarty factors apply. They limit the district court's discretion. And the Fogarty factor about deterrence that we're talking about here... Are you saying it's a Bright Line rule? I mean, you had me on the idea it's relevant. I'm not sure I'm seeing the Bright Line rule point. Well, here's the Bright Line rule I was getting to. This narrower part is Bright Line. It's a discretionary decision, sure, the fees, but the Fogarty factor that the district court relied on primarily was deterrence. And if we actually go back and look at Fogarty, when it lists these factors, some of them, like unreasonableness or frivolousness, they're just listed like that, one word. When we get to deterrence, it actually says then lead in particular cases for deterrence. And as the district court said in the Ducks Unlimited case, which is within this circuit, a fee award is not necessary when a permanent injunction has been added, especially here where the only deterrence at issue is special deterrence, deterring allegiance, not deterring anybody else. And so Fogarty and Ducks Unlimited should determine that issue. If your client was continuing to use the infringing material even after the district court entered summary judgment against you, would it be an abuse of discretion for the district court to think that you might not abide the injunction without further deterrence? It would be because the permanent injunction is the first time the district court would have said no more infringement. We can debate all we want about whether it was a good idea or a bad idea, a good business decision, bad business decision, to continue using the form after the summary judgment order. But the fact is the summary judgment order determined liability. The remedy hadn't been decided yet. There are a lot of problems with this discouragement opinion where you can see that we could have had a good basis to believe the damages ought to be zero. And so I do want to talk about discouragement real briefly. Mr. Thomas mentioned that he thought there was a typo in the district court's opinion. That opinion is internally inconsistent on its face. It says that the certificate is part of the product and it's not part of the product. This is a key question in the case. Just help me out with that. What's the problem there? It's part of the overall product is the way to think about it, and so be it that it comes later. Why is that so inconsistent? What's inconsistent is it's part of the product and it's not part of the product. That's what's inconsistent. Go back to magazines. I get a magazine subscription once a month that comes out. Because I get the subscription the week after that comes out, I have access to photographs or whatever it is that comes with it. It's just something that comes later. You wouldn't say you can now infringe later. Is the question about the traceability then or about the internal consistency? I'm just following up on your point about it being problematic that the form is relevant after the person leaves the lot. Right. That goes back to the tracing back analysis. We have to trace the revenue back to the infringement. And if we're tracing forward, we've got a problem. We've got it completely backwards. That's what I'm trying to tell you. I don't see why that's a problem. But I think the right sign, and I think I understand the gist of what you're trying to say. Thank you, Your Honor. If I may, I didn't get on Your Honor's point about the prejudice for not considering things at first. I might have tried it first if you thought it was important. You started with fees. Go ahead, 30 seconds. Okay, that's fine. Again, these are two different hurdles, two different requirements. If you get an originality, you still have sense of fair. By blurring those together, you're lowering the standard. This is a common structure in IP statutes. Is Feist wrong? Feist is not wrong. Feist is... Feist considers principles that could be attributable to merger and sense of fair and treats it as originality. Right. It should treat them separately in that particular case with the phone book. In that case, you would have some more overlap. In this case, not as much overlap, in particular because of things that Premier said. Premier, when it was talking about sense of fair, said, some people might want this in their program. Others might want that in their program. Exactly. It's third parties dictating this expression. Some might want this. Others might want that. Just like they said, they've got that Winfield case backwards. We don't go from copying to sense of fair. Got it. Thank you. Judge Clay has a question. Just to return to your earlier argument about sense of fair, what do you say about the contention that allegiance did not introduce evidence of summary judgment to show that any of the material in the certificate was mandated by industry standards as sense of fair requires? Even if you have to repeat yourself. What was the evidence? The evidence included the – Summary judgment, not reconsideration. Just answer that question first. The certificates that we put into the record, the agreement between Tricor and Premier, which said Tricor's insurer had to approve the language, the testimony of Premier's president, a great American, was using similar forms in its language, and the jury should have had the opportunity to weigh that testimony and decide for itself if the sense of fair defense was satisfied. And that's all? I mean, the forms were obviously already available and underlined the entire dispute, so that wasn't much to add. I'm talking about the third-party forms, for example, from this Heritage or Engine for Life form. I'm talking about third-party forms. And I'm also talking about, to get back to Lexmark, and I appreciate the extra time, to get back to Lexmark, Lexmark says practical realities come into play, too. There are only so many ways to describe the parts of a powertrain. There are only so many ways to say, get your oil changed every so often. And so that's the other issue. Thank you very much. We appreciate it. Thanks to both of you for your helpful briefs and for answering our questions. We're always grateful for that. The case can be submitted, and the clerk may call the next case.